UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
BRIAN SILVER,

                                        Plaintiff,

                                                                    **OPINION AND ORDER**
                - against -
                                                                    No. 15-CV-1792 (CS)

ENTERGY NUCLEAR OPERATIONS, INC., DANIEL
GAGNON and WAYNE GRIFFIN,

                                        Defendants.
-----------------------------------------------------------------------x

<u>Appearances</u>:

Amy L. Bellantoni, Esq.
The Bellantoni Law Firm, PLLC
Scarsdale, New York
*Counsel for Plaintiff*

Patrick M. Collins, Esq.
Christina M. Schmid, Esq.
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
New York, New York
*Counsel for Defendants Entergy Nuclear Operations, Inc.,*
*Daniel Gagnon, and Wayne Griffin*

Benjamin H. Banta, Esq.
Entergy Services, Inc.
New Orleans, Louisiana
*Counsel for Defendant Entergy Nuclear Operations, Inc.*

<u>Seibel, J.</u>

        Before the Court is the Motion for Summary Judgment of Defendants Entergy Nuclear

Operations, Inc. ("Entergy"), Daniel Gagnon, and Wayne Griffin (collectively "Defendants").

(Doc. 60.)  For the reasons set forth below, Defendants' motion is GRANTED.

# I.    BACKGROUND

The facts set forth below are taken from the parties' Local Rule 56.1 Statements and supporting materials, and are undisputed unless otherwise noted.

Entergy operates the Indian Point Energy Center ("IPEC"), a nuclear power plant under license from the U.S. Nuclear Regulatory Commission ("NRC"). (Doc. 64 ("P's 56.1 Stmt. & Resp.") ¶ 1.) Plaintiff Brian Silver was employed there as an armed nuclear security officer from 2008 until his termination on February 24, 2014. (*Id.* ¶ 22, 136.) This case arises out of Defendants' decisions to revoke Plaintiff's security access and terminate his employment after Plaintiff experienced a hallucinatory episode on December 22, 2013.

## A.    NRC Regulations

As a nuclear power plant operator, Entergy is required to adhere to numerous regulations promulgated by the NRC. (*Id.* ¶ 2.) These regulations mandate, among other things, that Entergy maintain a fitness-for-duty ("FFD") program and an access authorization program. *See* 10 C.F.R. §§ 26.23, 73.56 (2008).

The FFD program is designed "to provide reasonable assurance" that employees are "trustworthy and reliable" and "are not under the influence of any substance, legal, or illegal, or mentally or physically impaired from any cause, which in any way adversely affects their ability to safely and competently perform their duties." *Id.* § 26.23(a), (b). Those subject to the FFD program include all persons who are granted unescorted access authorization ("UAA") to protected areas of a nuclear power reactor and perform security duties as an armed security officer. *Id.* § 26.4(a)(5). Where an employee's fitness is questionable, the nuclear power plant operator is required to immediately remove that employee from duty. *Id.* § 26.77.

The NRC further mandates that a licensee have an access authorization program that "provide[s] high assurance" that any persons granted UAA to sensitive areas of the plant "are trustworthy and reliable, such that they do not constitute an unreasonable risk to public health and safety or the common defense and security, including the potential to commit radiological sabotage." *Id.* § 73.56(c). Accordingly, an individual seeking UAA must undergo a psychological evaluation designed "to assist in determining [that] individual's trustworthiness and reliability." *Id.* § 73.56(e). Once an individual obtains UAA, further psychological evaluations may be administered to reassess that person's fitness for duty, trustworthiness, and reliability. *Id.* § 73.56(e)(6). The access authorization program also entails a mandatory behavior observation program ("BOP") requiring those subject to the BOP to report any observed behaviors that may negatively affect the security of the facility or constitute an unreasonable risk to public health or safety. *Id.* § 73.56(f)(1)-(3). "If [a] reviewing official has a reason to believe that [a] reported individual's trustworthiness is questionable, the reviewing official shall either administratively withdraw or terminate the individual's [UAA] while completing the re-evaluation or investigation." *Id.* § 73.56(f)(3).

### B.    Entergy's Policies

Entergy has a written FFD Program, (Doc. 66 ("Schmid Aff.") Ex. C), and a written UAA Program, (*id.* Ex. D). Under the FFD policy, "'when there are indications that an individual . . . may be in violation of Entergy's FFD program or is otherwise unable to safely and competently perform his or her duties,'" a process is initiated called a determination of fitness for duty. (P's 56.1 Stmt. & Resp. ¶ 12 (quoting Schmid Aff. Ex. C at 51).) In accordance with NRC regulations, this determination "'must be made by a licensed or certified professional who is appropriately qualified . . . to evaluate the specific fitness issues presented by the individual.'"

(*Id.* ¶ 13 (quoting Schmid Aff. Ex. C at 51.))  If a licensed psychologist conducts an in-person clinical interview of an individual and determines that individual is untrustworthy, unreliable, or a potential risk to that individual's self or others, that individual's UAA shall be denied for one year.  (*Id.* ¶ 16; *see id.* ¶¶ 263-64.)  Although there is no NRC regulation that mandates this one-year denial period, it is consistent with industry standards.  (*Id.* ¶¶ 17, 264.)

### C. Plaintiff's Employment Period with Entergy

In 2008, Entergy hired Plaintiff as an armed nuclear security officer at IPEC.  (*Id.* ¶ 22.) This position required, among other things, obtaining and maintaining a valid license to carry firearms, meeting the requirements of NRC psychological testing regulations, satisfying NRC requirements to obtain UAA to the nuclear facility, and complying with Entergy's FFD Program. (*Id.* ¶¶ 23, 25.)  Plaintiff was aware of these requirements and understood he was subject to periodic psychological evaluations and for-cause drug testing pursuant to the FFD Program.  (*Id.* ¶¶ 25-29.)

On or about March 5, 2013, Plaintiff sought treatment from a licensed psychiatrist, Thomas Van Aken, M.D., to address personal and financial issues.  (*See id.* ¶ 42.)  Plaintiff reported a long-term history of anxiety and "an element of depression," for which Dr. Van Aken prescribed the drug Tofranil.  (*Id.* ¶¶ 44, 47.)  Approximately one month later, Plaintiff elected to stop taking that medication, and Dr. Van Aken prescribed the drug Neurontin, which is also known as gabapentin, to treat Plaintiff's anxiety.  (*See id.* ¶¶ 47-48.)  Dr. Van Aken considered Neurontin a safe drug based, in part, on the fact that he had never seen patients experience major side effects from it, nor did he recall learning from patients or medical literature that Neurontin caused major side effects like hallucinations.  (Schmid Aff. Ex. M at 27:3-18, 67:12-16.)

After not having seen Dr. Van Aken since April 2013, Plaintiff returned to the psychiatrist in October 2013,[1] reported that he had ceased taking Neurontin, and requested a prescription for Adderall to treat his Attention Deficit Disorder. (P's 56.1 Stmt. & Resp. ¶¶ 75-76, 167-68.) Plaintiff next returned to Dr. Van Aken on December 17, 2013, at which time Plaintiff reported that he had resumed taking Neurontin. (*Id.* ¶ 80.)

Then, on December 22, 2013, while he was at home and off duty, Plaintiff believed he saw an Entergy supervisor and two children going through his belongings in his living room. (*Id.* ¶¶ 89-90.) He called Entergy's security department several times as well as the New York State Police to report the unauthorized intrusion into his home. (*Id.* ¶¶ 91-92.) The responding police officers found Plaintiff in a confused and disoriented state. (*Id.* ¶ 92.) Eventually, however, Plaintiff realized that he had imagined the episode. (*Id.* ¶ 93.) The next day, he called in sick and went to see a doctor about his hallucination. (*Id.* ¶¶ 94-95.) He also received a call from Entergy instructing him to report to IPEC the next day for a for-cause drug test and evaluation. (*Id.* ¶ 97.)

On December 24, Plaintiff reported to IPEC and met with Defendant Griffin, Entergy's Supervisor of Access, Fitness for Duty and Medical at IPEC, who suspended Plaintiff's UAA. (*Id.* ¶¶ 98-99, 175.) Plaintiff was upset and crying during the meeting. (*Id.* ¶ 98.) Due to the behavioral concern stemming from the December 22 hallucination incident, Defendant Griffin directed Plaintiff to report for a "for cause" test as well as an in-person psychological assessment with Dr. Laurence Baker, a psychologist, regarding Plaintiff's fitness for duty. (*Id.* ¶¶ 98-99, 193.)

---

[1] In the interim, Plaintiff had been arrested for driving while ability impaired after consuming beer and snorting crushed Percocet pills. (P's 56.1 Stmt. & Resp. ¶¶ 54-60.) His UAA was revoked but eventually restored after he entered a mandatory substance abuse program and, after problems there, completed a more intensive program. (*Id.* ¶¶ 63-73; Schmid Aff. Ex. H at 46:6-7.)

That same day, Plaintiff met with Dr. Baker, who conducted a clinical interview and administered a standard written psychological test called the Millon Multiphasic Personality Inventory. (*Id.* ¶ 100.) Dr. Baker observed that Plaintiff was "uneasy" and "anxious," as "[a]lmost anybody in that situation would appear," as well as "highly emotional," "obviously upset," "off-and-on teary," "resentful and demanding," "troubled," "over-reactive," and "hypersensitive to criticism." (*Id.* ¶¶ 101, 108, 111; Schmid Aff. Ex. G at 51:2-8.) Plaintiff disclosed financial pressures, his history of alcohol and substance abuse, his hallucination, and his unreliability with his medications. (P's 56.1 Stmt. & Resp. ¶¶ 102, 104-05, 109.) Plaintiff also told Dr. Baker that he believed the Neurontin caused his hallucination. (*Id.* ¶ 200.)

Ultimately Dr. Baker concluded that Plaintiff "did not seem to be in a stable situation at that moment," and that Plaintiff's level of anxiety was "beyond the interview-based anxiety." (*Id.* ¶ 107) (alteration and internal quotation marks omitted). Accordingly, he told Plaintiff he did not think he should return to work, and Plaintiff agreed. (*Id.* ¶ 103.) Dr. Baker then wrote a report stating his opinions that Plaintiff was not fit for duty as an armed nuclear security officer and that Plaintiff's UAA should be revoked. (*Id.* ¶¶ 110, 116.) Dr. Baker did, however, believe that with treatment Plaintiff could return to fit-for-duty status. (*Id.* ¶ 212; Doc. 65 ("Bellantoni Decl.") Ex. 7 at 66:19-20.)

Dr. Baker's report also recommended that Plaintiff be put on short-term disability. (P's 56.1 Stmt. & Resp. ¶ 116.) During an annual audit in early January 2014, however, Defendant Griffin informed Dr. Baker that his role was to make a determination as to Plaintiff's trustworthiness and reliability, not to make a recommendation as to whether he should receive short-term disability. (*Id.* ¶¶ 119-21, 175.) Defendant Griffin then directed Dr. Baker to complete a standard-form Psychological Assessment Report, which Dr. Baker completed on or

about January 7, 2014, indicating that Plaintiff had "not been found to be acceptable for access authorization at a nuclear facility." (*Id.* ¶¶ 122-23.) Dr. Baker then revised his initial written report to delete his reference to short-term disability. (*Id.* ¶ 124.) Like the initial report, the revised version indicated that Plaintiff was not fit for duty and recommended that his access be denied. (*See* Schmid Aff. Ex. P at 7; *id.* Ex. DD at 7.)

On January 9, 2014, Plaintiff met with Dr. Van Aken and discussed the hallucinatory episode. (P's 56.1 Stmt. & Resp. ¶ 126.) Plaintiff reported that he had not been sleeping for three days prior to the episode and that he had since ceased taking Neurontin. (*Id.* ¶¶ 127-28.) Dr. Van Aken agreed with Plaintiff's decision to stop taking the medication and instead prescribed a thirty-day supply of Adderall. (*Id.* ¶¶ 128-29.)

On January 16, 2014, Defendant Griffin denied Plaintiff's UAA for one year. (*Id.* ¶ 130.) A few days later, Plaintiff submitted a letter to Defendant Griffin requesting an appeal of that decision, along with a note from Dr. Van Aken stating that Plaintiff no longer was taking gabapentin as of January 1, 2014, and a note that Plaintiff spoke with a pharmacist who indicated that 2700 mg per day of gabapentin could induce abnormal thinking. (*Id.* ¶¶ 132-33, 298-99.) Entergy upheld the denial of UAA on February 13, 2014. (*Id.* ¶ 135.)

A few days later, Thomas SanFratello, a nuclear security officer and the Chief Shop Steward of Plaintiff's union at IPEC, heard a rumor that Plaintiff was going to be terminated. (*Id.* ¶¶ 283, 285.) According to SanFratello, he called Defendant Griffin, who informed him that Defendant Daniel Gagnon, the Manager of Security at IPEC, had made the decision to terminate Plaintiff. (*Id.* ¶ 286; *see id.* ¶ 136.) SanFratello testified at his deposition that he responded, "Really? Do you think that maybe we jumped the gun here?," to which Defendant Griffin replied, "That's per Danny. He terminated him and he shouldn't have been terminated." (*Id.*

¶¶ 287-88 (quoting Bellantoni Decl. Ex. 18 at 17:1-15).)  SanFratello further testified that

Defendant Griffin told him that Plaintiff was supposed to have a second evaluation with Dr.

Baker.  (*Id.* ¶ 289.)  According to SanFratello, he then followed up with Defendant Gagnon to

ask him if he jumped the gun in firing Plaintiff, and Defendant Gagnon responded, "I can't have

him working here."  (*Id.* ¶¶ 291-92.)

Meanwhile, Defendant Gagnon proceeded with Entergy's formal review process for

termination of employment based on just cause.  (Bellantoni Decl. Ex. 4 at 19:6-20:6.)  Once that

process was complete, Defendant Gagnon sent a letter on Entergy's behalf that terminated

Plaintiff's employment, effective February 24, 2014, for failure to meet the psychological

standards required for UAA.  (P's 56.1 Stmt. & Resp. ¶ 136.)

Believing he was entitled to a reevaluation, Plaintiff asked Dr. Baker to reevaluate him in

April 2014.  (*Id.* ¶¶ 138-39.)  Although Dr. Baker would have conducted a reassessment of

Plaintiff on Entergy's request, he told Plaintiff he was unable to do the reevaluation and directed

Plaintiff to his recommendations in his prior reports.  (*Id.* ¶¶ 141-42; Schmid Aff. Ex. X.)

In June 2014, Plaintiff submitted to Entergy two notes concerning his mental health.  (P's

56.1 Stmt. & Resp. ¶¶ 143, 145; Schmid Aff. Exs. X, Y.)  The first was a note from Dr. Van

Aken stating that Plaintiff was "mentally stable to hold the position of nuclear security officer."

(P's 56.1 Stmt. & Resp. ¶ 143; Schmid. Aff. Ex. X.)  Dr. Van Aken, however, has no

recollection of speaking with Plaintiff in June 2014 and subsequently testified at his deposition

that he should not have signed off on the statement that Plaintiff was "mentally stable" because

he did not conduct a full examination of Plaintiff at that time.  (P's 56.1 Stmt. & Resp. ¶ 144.)

The second note was from Marilyn Rosenberg, a licensed clinical social worker whom Plaintiff

had seen for three sessions and who opined that Plaintiff was stable and mentally competent to work as a nuclear security officer.  (*Id.* ¶ 145; Schmid Aff. Ex. Y.)

Plaintiff and his Union filed two grievances challenging the denial of his UAA and the termination of his employment, both of which Entergy denied.  (P's 56.1 Stmt. & Resp. ¶ 152.)  After the Union demanded arbitration, Entergy and the Union jointly selected an arbitrator and scheduled an access arbitration hearing.  (*Id.* ¶ 153.)  That hearing began in September 2014 and continued in 2015, but was adjourned without date at Plaintiff's request in April 2015.  (*Id.* ¶¶ 154, 156-57.)  In April 2016, at Plaintiff's request, the Union withdrew the grievances challenging the denial of the UAA and termination of employment, and the arbitration demands were withdrawn without prejudice.  (*Id.* ¶ 158.)  At no point did Plaintiff seek reemployment with Entergy or reinstatement of his UAA after the expiration of the one-year denial period on January 16, 2015.  (*Id.* ¶ 159.)

After filing a complaint with the U.S. Equal Employment Opportunity Commission grounded in discrimination on the basis of being "regarded as" disabled in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, Plaintiff was issued a notice of his right to sue dated December 12, 2014.  (Doc. 1 ¶ 2.)  On March 11, 2015, Plaintiff brought this action, alleging that Entergy regarded him as having a disability and that its denial of UAA and termination of his employment violated the ADA; the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*; and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 290 *et seq.*  (*Id.* ¶¶ 179-185.)  Plaintiff further alleged that Defendants Griffin and Gagnon aided and abetted Entergy's alleged violation of the NYSHRL.  (*Id.* ¶¶ 186-87.)  Plaintiff also originally alleged a common law negligence claim against former Defendants Dr. Baker and Testing, Inc., (*id.* ¶¶ 188-89), but dismissed those claims by stipulation filed October 21, 2016, (Doc. 51).

## II.    **LEGAL STANDARDS**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and he "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including

those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." *Id.* 56(e)(2), (3).

## III.   DISCUSSION

### A.   ADA Claim

The ADA aims to prevent discrimination "against a qualified individual on the basis of disability in regard to," among other things, "privileges of employment" and "discharge" from employment. 42 U.S.C. § 12112(a). Claims under the ADA are analyzed under the familiar burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009). "A plaintiff must establish a *prima facie* case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the [decision(s)]; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (emphasis added).

#### 1.   Prima Facie Case

To establish a *prima facie* case of discrimination based on disability, a plaintiff must show: "'(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered [an] adverse employment action because

of his disability.'" *Cameron v. Cmty. Aid for Retarded Children, Inc.*, 335 F.3d 60, 63 (2d Cir. 2003) (alteration in original) (quoting *Giordano v. City of N.Y.*, 274 F.3d 740, 747 (2d Cir. 2001)).

"Disability" means "a physical or mental impairment that substantially limits one or more [of an individual's] major life activities," "a record of such impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(1). To be "regarded as having such an impairment," an individual must "establish[] that he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Id.* § 12102(3)(A). Here, Plaintiff asserts that he was not disabled but that Defendants regarded him as having a mental impairment. (*E.g.*, Doc. 63 ("P's Mem.") at 5.)

The crux of the parties' dispute is over the third element of a *prima facie* case of discrimination based on disability – whether Plaintiff was a qualified individual under the ADA. (*Id.* at 3-8; *see* Doc. 61 ("Ds' Mem.") at 5-14.) If Plaintiff was a qualified individual, any established discrimination against him on the basis of disability would violate the ADA. *See* 42 U.S.C. § 12112(a). "The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8). This inquiry is made with respect to the individual's condition at the time of the alleged adverse employment action. *Sherman v. Cty. of Suffolk*, 71 F. Supp. 3d 332, 346 (E.D.N.Y. 2014); *Bohen v. Potter*, No. 04-CV-1039, 2009 WL 791356, at *9 (W.D.N.Y. Mar. 23, 2009); *King v. Town of Wallkill*, 302 F. Supp. 2d 279, 289 (S.D.N.Y. 2004). Plaintiff asserts that there were two adverse employment actions: (1) the denial of his UAA, and (2) the termination of his employment. (P's Mem. at 6.) This Court will

address each action in turn.

a. *Termination of Plaintiff's UAA*

Plaintiff asserts that the termination of his UAA on January 16, 2014, violated the ADA because he was a qualified individual at the time of this adverse employment action. (*Id.* at 6-7.) "[L]egally defined job qualifications constitute essential functions under the ADA." *Mathieson v. Am. Elec. Power*, Nos. 00-CV-870, 00-CV-871, 2002 U.S. Dist. LEXIS 6560, at *9 (W.D. Mich. Jan. 14, 2002) (citing *Albertsons, Inc. v. Kirkingburg*, 527 U.S. 555, 570-75 (1999)), *adopted by* 2002 U.S. Dist. LEXIS 3051 (W.D. Mich. Feb. 20, 2002). As discussed above, NRC regulations mandate that those who are granted UAA be fit for duty. Thus, to be qualified under the ADA, Plaintiff must have been fit for duty. *Stevens v. S. Nuclear Operating Co.*, 209 F. Supp. 3d 1372, 1379 (S.D. Ga. 2016) ("[C]ourts have found being fit for duty an essential job function at NRC-regulated nuclear facilities."). The undisputed facts indicate that Dr. Baker evaluated Plaintiff on December 24, 2013, and determined he was unfit and should not return to work. (P's 56.1 Stmt. & Resp. ¶¶ 101, 103, 110.) Indeed, even Plaintiff does not seem to dispute that, at least on the day of the evaluation, he was not fit for duty. (*See id.* ¶ 103.) Because fitness for duty is legally required for UAA, Plaintiff was not qualified under the ADA at that time.

Although Plaintiff's arguments are not entirely clear, he seems to assert that Dr. Baker's conclusion regarding Plaintiff's fitness was based on an anxiety disorder that Plaintiff openly had for years but which had never rendered him unfit, and that his hallucination likely was caused by the Neurontin that Plaintiff asserts he ceased taking by January 9, 2014. (*See* P's Mem. at 6.) Plaintiff provides no support, however, for this characterization. To the contrary, it is undisputed that Dr. Baker regarded Plaintiff as "a troubled man" who "greatly minimized" and failed to

"tak[e] ownership of his behavior"; whose mind by his own account "is constantly scattered [and] races"; who suffered from "a combination of a generalized anxiety disorder and a bipolar disorder, manic"; and who "has been unreliable about his medications" and has not gotten the psychotherapy he also needs out of "a disinclination to trust therapy." (Schmid. Aff. Ex. P at 4, 6.) It is also undisputed that Dr. Baker recommended that Plaintiff should be referred for "both psychotherapy and reevaluation of his psychoactive medication regimen," and that Plaintiff's access should be revoked "[u]ntil such ti[m]e as, and unless, the treating professionals agreed that he is fit for duty." (*Id.* at 7.)[2] In other words, on the undisputed facts it is clear that Dr. Baker did not suggest that Plaintiff's impairment was transitory or that Plaintiff would be fit for duty once he stopped taking Neurontin. Rather, he concluded that Plaintiff would be unfit until his medications were adjusted, he underwent psychotherapy and he was cleared by his treating doctors. Plaintiff presents no facts suggesting that those things had occurred at the time his access was terminated. Even if Plaintiff disagrees with Dr. Baker's conclusions, it is undisputed that Dr. Baker's evaluation was the information on which Defendant Griffin relied in suspending Plaintiff's UAA, and Plaintiff provides no basis on which a reasonable jury could conclude that Defendant Griffin should have, or responsibly could have, ignored or otherwise overruled Dr. Baker's assessment.

### b. *Termination of Plaintiff's Employment*

Plaintiff's second asserted adverse employment action is the termination of his employment. Plaintiff argues that he was a qualified individual under the ADA at the time of

---

[2] Plaintiff argues that the hallucination might have been a reaction to the Neurontin (which seems unlikely given that Plaintiff told Dr. Baker that he had been taking that medication for about two months at the time of the incident, (*see* Schmid Aff. Ex. P)), and therefore a medical, as opposed to a psychological, event, (*see* P's Mem. at 17-19). To whatever extent that may be the case, it is insufficient to raise an issue of fact because it is clear from Dr. Baker's evaluation that his recommendation of denial of access was not based on the hallucination.

that action, despite his lack of UAA, because UAA was not an essential function of his role as an armed nuclear security officer.

"[A] court will give considerable deference to an employer's determination as to what functions are essential." *McMillan v. City of N.Y.*, 711 F.3d 120, 126 (2d Cir. 2013); *see* 42 U.S.C. § 12111(8) ("consideration shall be given to the employer's judgment as to what functions of a job are essential"). "The sensitive nature of the nuclear power industry and the extensive regulation of that industry by the NRC both suggest that the consideration given to the employer's determinations in this area should be especially deferential." *Lute v. Dominion Nuclear Conn., Inc.*, No. 12-CV-1412, 2015 WL 1456769, at *11 n.8 (D. Conn. Mar. 30, 2015). That deference notwithstanding, "there are a number of relevant factors that may influence a court's ultimate conclusion as to a position's essential functions," including "the employer's judgment, written job descriptions, the amount of time spent on the job performing the function, the mention of the function in a collective bargaining agreement, the work experience of past employees in the position, and the work experience of current employees in similar positions." *McMillan*, 711 F.3d at 126 (citing *Stone v. City of Mt. Vernon*, 118 F.3d 92, 97 (2d Cir. 1997)); *see* 29 C.F.R. § 1630.2(n)(2) (2012). Indeed, "a court must conduct a 'fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice.'" *McMillan*, 711 F.3d at 126 (quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 137-38 (2d Cir. 1995)).

According to the position description for a nuclear security officer, all individuals employed in that capacity must, among other things, obtain UAA to the nuclear facility. (P's 56.1 Stmt. & Resp. ¶ 23 (citing Schmid Aff. Ex. I).) The collective bargaining agreement between Entergy and Plaintiff's union similarly provides that "unescorted access authorization

shall be a necessary job qualification" for a nuclear security officer and that the "failure or inability to obtain or maintain [UAA] shall constitute valid grounds for the termination of a bargaining employee." (Schmid Aff. Ex. L at Art. 6 § 3(7).)[3] In similar circumstances, courts have found UAA to be an essential function. *See, e.g.*, *Lute*, 2015 WL 1456769, at *8-10 (UAA was essential function of being equipment operator at nuclear power station because employer required those in that position to maintain UAA); *Sysko v. PPL Corp.*, No. 07-CV-470, 2009 WL 4725240, at *8 (M.D. Pa. Dec. 2, 2009) (UAA was essential function of being instrument and controls technician at nuclear power station because employer required employees in that position to maintain their security access status); *McDaniel v. AlliedSignal, Inc.*, 896 F. Supp. 1482, 1488-89 (W.D. Mo. 1995) (relying on, among other things, employer's employee handbook, collective bargaining agreement, and employer's new hire "security packet" to conclude that security clearance was essential function of employment position at issue). This Court sees no reason not to so hold here. Because UAA is an essential function for the position of an armed nuclear security officer at Entergy, Plaintiff's loss of UAA rendered him not otherwise qualified under the ADA. *See e.g.*, *Lute*, 2015 WL 1456769, at *11 (equipment operator at nuclear plant was not otherwise qualified under ADA due to failure to maintain UAA); *Sysko*, 2009 WL 4725240, at *11 ("Revocation of his unescorted access status rendered Plaintiff 'unqualified' for his position as an Instrument and Control Technician [at a nuclear power facility]."); *Mathieson*, 2002 U.S. Dist. LEXIS 6560, at *3, *8-11 (former boilermaker at nuclear power plant was not a "qualified individual" under ADA because he was unable to

---

[3] The record reveals little about the amount of time spent on tasks requiring UAA, but common sense suggests that an armed security officer at a nuclear plant must access protected areas both routinely and in emergencies. While such officers can be temporarily assigned outside protected areas while paperwork snafus relating to UAA are resolved, (Schmid Aff. Ex. J at 26:12-27:11; Bellantoni Decl. Ex. 18 at 27:10-16), there is no evidence of the existence of a long-term armed security officer function for which UAA is not a requirement.

perform essential functions of his job when unescorted access was denied); *McCoy v. Pa. Power & Light Co.*, 933 F. Supp. 438, 443 (M.D. Pa. 1996) (former nuclear plant operator's loss of security clearance rendered him not qualified under ADA because maintaining security clearance was essential part of job).

Plaintiff makes no effort to dispute the core holdings of these cases, and his attempts to distinguish them are unavailing. That some plaintiffs in those cases lost their UAA due to aberrant behavior on the job does not undermine the courts' conclusions that the revocation of UAA renders an individual unqualified under the ADA. That some plaintiffs had actual disabilities, whereas here Plaintiff only asserts that he was "regarded as" disabled, is likewise irrelevant. The denial of UAA renders an individual unqualified where, as here, UAA is an essential function of the job, regardless of whether the individual bringing the claim asserts he is actually disabled or regarded as disabled by his employer. In sum, because UAA was an essential function of Plaintiff's job, Plaintiff's failure to maintain his UAA at the time of his termination rendered him unqualified under the ADA as a matter of law.

### c. *Failure to Accommodate*

Plaintiff further argues that Defendants were required to engage Plaintiff in an interactive process to determine a reasonable accommodation, and that their failure to do so constitutes a violation under the ADA. (*See* P's Mem. at 8-12.) He asserts that Defendants could have assigned him to a different position that did not require UAA, administered another psychological evaluation, or placed him on short-term disability leave. (*See id.* at 11-12.) But "[e]mployers do not need to reasonably accommodate individuals who do not have an actual disability." *Hernandez v. Int'l Shoppes, LLC*, 100 F. Supp. 3d 232, 251 (E.D.N.Y. 2015); *see* 42 U.S.C. § 12201(h) ("A covered entity under subchapter I . . . need not provide a reasonable

accommodation or a reasonable modification to policies, practices, or procedures to an individual who meets the definition of disability . . . solely under [the 'regarded-as' definition]."); *Powers v. USF Holland, Inc.*, 667 F.3d 815, 823 n.7 (7th Cir. 2011) (ADA Amendments Act of 2008 "clarified that an individual 'regarded as' disabled (as opposed to actually disabled) is not entitled to a 'reasonable accommodation'"); *Best v. Duane Reade Drugs*, No. 14-CV-2648, 2017 WL 218251, at *3 n.6 (S.D.N.Y. Jan. 11, 2017) ("Failure-to-accommodate claims cannot be asserted under the 'be[ing] regarded as' prong of the ADA's definition of disability . . . ."), *appeal filed*, No. 17-380 (2d Cir. Feb. 8, 2017); *Morris v. Town of Islip*, No. 12-CV-2984, 2014 WL 4700227, at *8 (E.D.N.Y. Sept. 22, 2014) ("[T]he 'regarded as' theory of disability is no longer actionable in the context of a failure to accommodate claim.").  Plaintiff's reliance on cases holding to the contrary is misplaced, as those cases pre-date and were abrogated by the ADA Amendments Act of 2008, which clarified that an employer has no obligation to accommodate an individual who is "regarded as" disabled.

Plaintiff asserts that he was not disabled at any point during his employment at Entergy, (P's 56.1 Stmt. & Resp. ¶ 254), and bases his claims solely under the "regarded as" prong of the ADA's definition of disability, (*see* P's Mem. at 4-5).  Because Defendants were not required to accommodate Plaintiff or initiate an interactive process under 29 C.F.R. § 1630.2(o)(3) to identify an accommodation, their alleged failure to take these actions cannot constitute a violation of the ADA.

2.      Legitimate Reasons for Defendants' Actions

Even assuming Plaintiff could establish a prima facie case of discrimination under the ADA, Defendants have satisfied their burden to articulate legitimate, non-discriminatory reasons for their actions:  that Plaintiff's failure to meet psychological standards justified the revocation

of Plaintiff's UAA and that the loss of UAA justified Plaintiff's subsequent termination. (Ds'

Mem. at 18.)

The undisputed facts demonstrate that Dr. Baker examined Plaintiff after he experienced

what appeared to be a hallucinatory event. (P's 56.1 Stmt. & Resp. ¶ 100.) During that

evaluation, Dr. Baker determined, and Plaintiff agreed, that Plaintiff was not fit to return to work

as an armed nuclear security officer. (*Id.* ¶¶ 103, 110; Schmid Aff. Ex. G at 57:1-5.) Dr. Baker

recommended that Plaintiff's UAA be revoked because he was not fit for duty, and that it not be

reinstated until Plaintiff was treated with medication and psychotherapy and was cleared to

return by his providers. (Schmid Aff. Ex P at 7.) Entergy's written access authorization policy

provides that if an individual is denied UAA based on a psychological assessment that indicates

the individual is "'untrustworthy, unreliable, or a potential risk to self or others'" – or, in other

words, not fit for duty (*see* 10 C.F.R. § 26.23) – that individual's UAA shall be denied for a

period of one year, which is a period consistent with industry standards. (P's 56.1 Stmt. & Resp.

¶ 16 (citing Schmid Aff. Ex. E); *id.* ¶ 17.) Defendant Griffin relied on this policy in terminating

Plaintiff's UAA for one year. (*Id.* ¶ 130.)[4] Consequently, Plaintiff was no longer able to

perform the essential functions of his position as an armed nuclear security officer, as discussed

above. Upon completion of the appeal process for Plaintiff's loss of UAA, Defendant Gagnon

terminated Plaintiff's employment based on his failure to meet the psychological standards

required for UAA. (*Id.* ¶ 136.)

---

[4] Although Plaintiff denies some of the assertions of fact in paragraph 130 of Defendants' 56.1 Statements, he does not specifically dispute, or provide alternative citations to the record concerning, Defendants' assertion that Defendant Griffin relied on Entergy's policies in terminating Plaintiff's UAA for one year. Accordingly, this statement is deemed admitted for purposes of Defendants' summary judgment motion. *Cooper v. City of New Rochelle*, 925 F. Supp. 2d 588, 602 (S.D.N.Y. 2013) (alterations omitted); *see* Local Rule 56.1(c).

3. Pretext

Because Defendants have articulated legitimate, nondiscriminatory reasons for terminating Plaintiff's UAA and employment, the burden shifts back to Plaintiff to produce evidence that Defendants' proffered explanations are a pretext for discrimination. *Sista*, 445 F.3d at 169. "The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant[s] were false, and that more likely than not discrimination was the real reason for the employment action." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (alterations, internal quotations marks, and citation omitted), *superseded by statute on other grounds as stated in Ochei v. Coler/Goldwater Mem'l Hosp.*, 450 F. Supp. 2d 275, 282-83 (S.D.N.Y. 2006). "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." *Id.*[5]

Plaintiff has not provided facts from which a rational jury could infer that Defendants' articulated reasons are false or were intended to mask discrimination on the basis of disability. He has offered no evidence that Defendants did not reasonably believe Dr. Baker's report that Plaintiff was unfit. *Cf. Stevens*, 209 F. Supp. 3d at 1380. Likewise, Plaintiff has not shown that Defendants did not reasonably believe that, under Entergy's policies, Dr. Baker's determination required that Plaintiff's UAA be suspended for one year, and that the loss of UAA provided reasonable grounds for terminating Plaintiff from a position for which maintaining UAA was an

---

[5] Some courts have held that an ADA plaintiff must establish that his alleged perceived disability was the "but-for" reason for his employer's termination of his employment. *See, e.g., Gentry v. E. W. Partners Club Mgmt. Co.*, 816 F.3d 228, 235-36 (4th Cir. 2016); *see also Widomski v. S.U.N.Y. at Orange*, 933 F. Supp. 2d 534, 546 n.9 (S.D.N.Y. 2013) (collecting cases), *aff'd*, 748 F.3d 471 (2d Cir. 2014). The Second Circuit, however, has yet to weigh in on this issue. *See Eisner v. Cardozo*, 684 F. App'x 29, 30 (2d Cir. 2017) (summary order); *Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 586 F. App'x 739, 745 n.3 (2d Cir. 2014) (summary order). This Court need not determine whether proof of but-for causation is required because Plaintiff has failed to establish a prima facie case of discrimination (as discussed above) and to produce sufficient evidence that Defendants' non-discriminatory reasons for terminating his UAA and employment were pretextual (as discussed below).

essential function.

Plaintiff's arguments to the contrary are undeveloped, unsupported by citations to the record or unclear, or simply miss the mark. (*See* P's Mem. at 15-20.) He asserts that Defendant Griffin terminated his access and Defendant Gagnon terminated his employment because they believed he was psychologically impaired, (*id.* at 15), but this characterization is a gross oversimplification that ignores the ramifications of the psychological assessment. Defendant Griffin testified that he made his decision to terminate Plaintiff's access based on Entergy's policy requiring a one-year denial period for individuals who are found unfit after a psychological assessment, (Schmid Aff. Ex. F at 84:5-85:10; *id.* Ex. E.; P's 56.1 Stmt. & Resp. ¶ 130), while Defendant Gagnon relied on Plaintiff's failure to meet the psychological standards required for UAA to terminate Plaintiff's employment, (Schmid Aff. Ex. U; P's 56.1 Stmt. & Resp. ¶ 136). Plaintiff cites no evidence suggesting that the existence of a psychological impairment *per se*, as opposed to an impairment precluding access, was the basis of Defendants' decisions.

Plaintiff also contends that Defendants cannot claim that they were acting lawfully while they were disregarding their obligations to accommodate Plaintiff, provide him with a second evaluation, and refer him to a medical doctor for further assessment. (P's Mem. at 16-20.) But, as discussed above, Defendants had no obligation to accommodate Plaintiff under the ADA, and Plaintiff does not point to any policy that required a second evaluation or a referral to a medical doctor where a psychological assessment resulted in a finding that the individual was unfit. Plaintiff further argues that Defendants failed to consider whether Plaintiff's condition was temporary and whether he should have been evaluated by a medical doctor, and that Defendant Griffin was not obligated to terminate Plaintiff's UAA and should have categorized the issue as

an "Uncategorized Event," for which the UAA denial period is determined on a case-by-case basis. (*Id.*)[6] While a reevaluation, referral, or different categorization might have been compassionate, an employer – particularly one in a highly sensitive and regulated industry – has no obligation to be compassionate, and its failure to be so is not evidence of pretext. *Cf. McGuire-Welch v. House of the Good Shepard*, 219 F. Supp. 3d 330, 347 (N.D.N.Y.) (defendants' lack of compassion and understanding in terminating plaintiff did not constitute employment discrimination), *appeal filed*, No. 16-4095 (2d Cir. Dec. 7, 2016).

"While [this Court] must ensure that employers do not act in a discriminatory fashion, [this Court] do[es] 'not sit as a super-personnel department that reexamines an entity's business decisions.'" *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014) (quoting *Scaria v. Rubin*, 117 F.3d 652, 655 (2d Cir. 1997)); *Schwarzkopf v. Sikorsky Aircraft Corp.*, 607 F. App'x 82, 82 (2d Cir. 2015) (summary order). "[I]t is not [this Court's] province to decide whether th[e] reason[s] w[ere] wise, fair, or even correct, ultimately, so long as [they] truly w[ere] the reason[s] for the [P]laintiff's termination" and the denial of his UAA. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (7th Cir. 1997); *see Clay v. Hyatt Regency Hotel*, 724 F.2d 721, 725 (8th Cir. 1984) ("While an employer's judgment may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was pretext for illegal discrimination.").

Because Plaintiff has failed to raise issues of fact with respect to whether he was a qualified individual under the ADA, and whether Defendants' reasons for terminating his UAA and his employment were a pretext for discrimination, Entergy is entitled to summary judgment

---

[6] These arguments presume that it was the hallucination – which Plaintiff regards as a temporary side effect of the Neurontin – that was the basis for Dr. Baker's recommendation that access be revoked, but (as discussed at pages 13-14 above) the recommendation was based on Plaintiff's other uncontrolled psychiatric issues.

on Plaintiff's ADA claim.

### B. Rehabilitation Act Claim

To prevail on a claim under the Rehabilitation Act, "[Plaintiff] must establish that (1) [he] is an individual with a disability within the meaning of the Act, (2) [he] is otherwise qualified to perform the job in question, (3) [he] was excluded from the job solely because of h[is] disability, and (4) h[is] employer received federal funding." *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 135 (2d Cir. 1995). "Courts generally apply the same legal standards when adjudicating claims arising under the ADA and ones arising under the Rehabilitation Act." *Bryant v. Steele*, 25 F. Supp. 3d 233, 242 (E.D.N.Y 2014); *see Harris v. Miller*, 572 F.3d 66, 73-74 (2d Cir. 2009) ("In most cases, the standards are the same for actions under both [the ADA and the Rehabilitation Act].") (alteration, citation, and internal quotation marks omitted).

As stated above, Plaintiff's ADA claim fails. Further, he concedes that there is no evidence that Entergy received federal funding. (P's Mem. at 3 n.2.) Accordingly, Entergy's motion for summary judgment on Plaintiff's Rehabilitation Act claim is granted.

### C. NYSHRL Claims

In addition to his statutory claims under federal law, Plaintiff further alleges that his rights were violated under New York law. The "traditional 'values of judicial economy, convenience, fairness, and comity'" weigh in favor of declining to exercise supplemental jurisdiction where all federal-law claims are eliminated before trial. *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). Having determined that Plaintiff's ADA and Rehabilitation Act claims should be dismissed, this Court declines to exercise supplemental jurisdiction over Plaintiff's remaining NYSHRL claims. 28 U.S.C. § 1367(c)(3); *see Giordano*, 274 F.3d at 754; *Hernandez*, 100 F.

Supp. 3d at 256 (collecting cases).

IV. **CONCLUSION**

For the reasons stated above, Defendants' motion for summary judgment is GRANTED. (Doc. 60.)  Plaintiff's claims under the ADA and the Rehabilitation Act are dismissed with prejudice, and his claims under the NYSHRL are dismissed without prejudice.  The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 60), enter judgment for Defendants, and close the case.

**SO ORDERED.**

Dated: November 15, 2017
      White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.